HENDERSON v. INDUSTRIAL COMMISSION et al.

No. 5229. Decided October 21, 1932.   (15 P. [2d] 302.)

*L. A. McGee,* of Price, for plaintiff.

*Geo. P. Parker,* Attorney General, and *M. Logan Rich,* Deputy Attorney General, for defendants.

CHRISTENSEN, District Judge.

A proceeding of the Industrial Commission denying an award of compensation to the applicant, Diehl Henderson,

is prosecuted before this court to review the action of the commission in so denying compensation. The application of said plaintiff was filed with the Industrial Commission under date of June 9, 1931, and two hearings were held by the commission on this application, on July 9, 1931 and on July 27, 1931, respectively. At these hearings the following material facts were developed by the evidence, without any contradiction:

That the applicant, on December 20, 1930, the date of the alleged accidental injury, was an employee of the National Coal Company, an employer subject to the Workmen's Compensation Act of this state (Comp. Laws 1917, § 3061 et seq., as amended). At that time the applicant was employed as haulage boss in the company's mine at National, Utah, and had worked for the company steady, every day the mine worked, for fifteen or sixteen months, and had been in good health until the day of the accident, and had not had any trouble with his left leg before. At approximately 11 o'clock a. m. on the above-mentioned date the applicant was endeavoring, in connection with some fellow employees, to place on the track a derailed mine car; a timber about eight feet long and ten inches in diameter, which was being used for this purpose, slipped and struck the applicant about eight inches below the hip on the inside of the left thigh, and at that moment the applicant said, "Oh!" and walked away. About twenty minutes later he examined his leg and there appeared to be a red bruise upon it; after cleaning up the wreck he complained to the fire boss, A. E. Robinson, of a burning sensation in the groin from the effect of the slip of the prop; he also said to D. F. Newberry, a motorman, who assisted in placing the derailed mine car on the track and who saw the timber slip and strike the plaintiff, that the timber had struck him in the groin. He, however, continued to work his shift and then took the place of said Newberry on the motor during the latter part of said Newberry's shift. Newberry coaxed him to take his place as he (Newberry) was anxious to get off. Plaintiff went home

at about 8 o'clock and was at that time limping. From the time of his return home the applicant became rapidly worse, and within a couple of hours was out of his head. Doctor W. C. Walker was called in, at which time the applicant was unable to give him a rational statement of what had happened. The doctor found redness and swelling in his left groin and his fever was between 103 and 104; and also found a small ulcer on the end of his penis. Dr. Walker did not find a break on the skin at the region of the injury. The applicant rapidly grew worse and was removed to the Price City Hospital, where he was examined and thereafter treated for a period of two weeks by Dr. C. L. Kline. Dr. Kline made his first examination on the 6th day after the injury and found a swollen and badly infected region in the left groin, and supuration of the tissue, septicaemia, and encephalitis caused from this injury. The applicant was still irrational and so remained in all about six weeks. Dr. Kline did not, at the time of his examination, find any break in the skin at the place of the injury, but did observe a very small denuded area on the glans of the penis. The applicant had not yet recovered from the infection in his left groin at the time of the said hearings before the Industrial Commission.

The controversy in this case arises over the findings by the Industrial Commission that applicant has failed to sustain, by a preponderance of the evidence—and the burden of proof is upon him—that the disability of which he herein complains was in any wise connected with the accident sustained by him. Said findings being based upon the evidence of the doctors that the condition which developed in the patient after the injury was due to streptococcic inflammation producing septicaemia and encephalitis; yet no portal of entry for the disease germs which caused said infection was found by either of said doctors at the alleged place on the body where the timber struck applicant; and the further evidence by the attending physicians that the said disease germs could have found a portal

of entry at what Dr. Walker called an ulcer, but which was denominated by Dr. Kline as a very small denuded area on the glans of the penis. It was contended by the claim adjuster of the state insurance fund, Mr. M. E. Iverson, who attended the said hearings and assisted in conducting the examination, that the plaintiff suffered from streptococcic infection, perhaps of a wide variety, but not connected with anything of a venereal nature, and which was not in any way connected with the accidental injury to the plaintiff. It is contended by the applicant that the finding of the commission is not only not supported by the evidence in the case, but is directly contrary to said evidence. We are, therefore, required to examine the evidence which is brought here for review respecting the particular point in issue.

The plaintiff, in answer to questions propounded by Commissioner Knerr, testified:

"Q. Either chafed or laceration or anything? A. Just a small scratched spot on the leg, kind of a bruise on the leg. I would not say it was cut.

"Q. But you have a distinct recollection that about twenty minutes after it looked as if it was chafed there? A. Yes.

"Q. Sort of a scratching of the skin slightly is that right? A. Yes."

Dr. Walker, in answer to questions propounded by Mr. Iverson, testified as follows:

"You were called to his home? A. Yes.

"Q. What history was given you relative to an accident at that time? A. My record shows that Mr. Henderson was haulage boss, and pulling on rope, felt sharp pain in left groin. Sharp pain lasted only for few minutes. Worked rest of day but leg pained him at intervals. Pain and tenderness in left femoral triangle.

"Q. How did you get that history if you recall? A. From Mr. Henderson.

"Q. Was he rational so far as you were able to determine? A. No, he was not rational.

"Q. What did you find with respect to the left groin? A. He had redness in his left groin, and his fever was between 103 and 104.

"Q. You found no particular point indicating trauma? A. Not except the redness and swelling. There was nothing in the left groin, no break in the skin.

"Q. About how many square inches seemed to be red and inflamed? A. It was quite a large area, about five or six inches across.

"Q. The area that you point to, the ligament is several inches above the crotch? A. It is in the crotch.

"Q. If the history was to the effect that he had hold of a timber and the timber slipped from the cable and bumped him in that region 12 hours before you saw him, would that alter your opinion Doctor? A. Yes, it would, because it could have been—The sharp end on the end of a timber could break it. It might be a slight break like a pin break and close up.

"Q. Could the condition that developed have developed within the period of twelve hours, as you found it? A. Yes, it could have.

"Q. In other words in your opinion a stereptococcus agent in there twelve hours before you saw him at that point might have produced all the symptons found by you? A. Yes.

"Q. Would the break you found on the end of the penis have furnished a portal of entry? A. Yes. There was no inflammation around that ulcer.

"Q. Would it necessarily have to be? A. No.

"Q. So it is entirely possible it may have entered from that source? A. Yes.

"Q. Or a microscopic portal of entry in the groin? A. Yes."

In answer to questions propounded by Mr. McGee, attorney for plaintiff, Dr. Walker testified:

"Q. Did you make a diagnosis when you were first called in? A. I did not.

"Q. Did you have an opinion, or a diagnosis in your own mind, but didn't express it? A. Well, it was hard to make a diagnosis from the history. You certainly would not get a picture of this kind from a foot slipping pulling on a rope. But of course I didn't get this other history at that time, as he was irrational. He wanted to be let alone. He was a little irritable, so I didn't question him much. But the diagnosis I made out was an infection in the groin.

"Q. Do I understand, Doctor, that if the ulcer on the head of the penis was the portal of entry for the streptococcic germ, the first symptom would be manifest in the lymphatics of the groin? A. No. I said it was possible for it to be.

"Q. Where would you expect them to be first manifest? A. In the lymphatics of the penis.

"Q. And the lymphatics in the penis were nil? A. They were."

The witness, in this connection, further stated:

"We have an ulcer on the penis that we can see, and we have a supposition that there might be a microscopical area on the leg. That is supposition, and the other is a fact. So we take it for granted it was from the penis, although we can't say for sure."

In answer to questions propounded by Commissioner Mc-Shane the witness testified:

"Q. Is it not possible for a man or a person who receives a rather severe trauma over a large surface, to produce a microscopical portal of entry that would not be seen by the naked eye? A. Certainly.

"Q. And the condition you found there indicated that there had been an injury in the area you referred to, and that injury was evidenced by swelling and by tenderness and redness? A. It certainly was.

"Q. Could the condition you found there be produced by an impact from a timber which was thrown against him with such degree of force as you would expect from the tightening of a rope, the rope being pulled by an engine, and in pulling it over the post or prop it threw it with such force and violence as to call his attention to it at least? A. Yes, it could have been caused by that, but it could not unless there was a break in the skin.

"Q. It might be a break in the skin, but you didn't make a microscopical examination of the skin? No.

"Q. And there could have been a portal of entry you didn't see? A. Yes."

Upon being recalled, Dr. W. C. Walker further testified as follows (examination by Commissioner McShane):

Q. Doctor, in your report, filed December 27, 1930, I observe in there in paragraph two where you say, 'Pain and tenderness in the left femoral triangle, lacerated muscle,' and then there is a question mark, and 'no hernia.' What did you mean by lacerated muscle? A. Usually taken as a bruised muscle or a muscle that is broken. What I meant by 'lacerated muscle' was that I didn't know what was the matter with him. That was a wild guess."

By Mr. McGee:

"Q. Your history came from an irrational man? A. Yes.

"Q. But now having regained his rational mind he gives a different history. Now he says that he was struck by a timber thrown upon his leg. If you had had that history at the time would you have made your report different? A. It would have been an infection caused from this injury.

"Q. That is the injury by the timber striking him on the leg? A. Yes.

"Q. It would naturally have been that, would it not? A. Yes."

By Mr. Iverson: "Q. So you aren't so sure as to what your opinion might be. A. From what Mr. McGee said, if the injury was caused from a timber striking him on the leg, you would take that history as correct and his injury caused from that."

Dr. Walker later being recalled further testified as follows (examination by Mr. McGee) :

"Q. After hearing Mr. Newberry's testimony would that make any difference in your diagnosis? A. If I had had that history I would have made a diagnosis of it being from the injury."

The said witness, in describing the small denuded area on the glans of the penis, said "It looked as if it had been cut by a hair or sharp instrument. There was no bruise."

Dr. C. L. Kline was called as a witness and testified, among other things, with respect to the infective agent. Examination by Mr. Iverson:

"Q. Was it your thought that it may have circulated in the blood stream and the trauma excited it to activity? A. No; it was my opinion that the encephalitis was due to an injury in the groin.

"Q. You don't know what occasioned the infection in the groin? A. I do not."

In answer to question propounded by Mr. McGee the witness said:

"A break in the skin could have healed over and not been noticeable by the time I saw him and yet could allow infection."

In the brief of defendant Industrial Commission of Utah, its counsel takes as conclusive the statement of Dr. Walker that the ulcer on the penis was a fact and the microscopic break in the skin of the groin was supposition "so we take it for granted it was from the penis although we can't say for sure." Yet this witness, after learning the true history of the case and of the accidental injury, repeatedly stated that, if he had had that history, his report would have been

that it was an infection caused from this injury; and after hearing Mr. Newberry's testimony, he said: "If I had had that history I would have made a diagnosis of it being from the injury." And Dr. Kline stated in answer to Mr. Iverson's inquiry, "No, it was my opinion that the encephalitis was due to an injury in the groin."

Dr. Walker repeatedly called the very small denuded area on the glans of the penis an "ulcer," and counsel for the Industrial Commission of Utah, in its brief, also makes frequent use of the word "ulcer." It does not appear, however, that the description of the said denuded area could possibly have been an ulcer, which is defined by medical authorities as being "a solution of continuity occurring upon the surface of the skin, or of any of the mucous membranes, and causing gradual disintegration and necrosis of the tissue, a sore discharging pus."

It was the opinion of the examining doctors that the diseases from which the plaintiff suffered immediately following the accident were caused by some streptococcic germ which they say could have had its portal of entry at the denuded area on the glans of the penis, or could have entered by microscopic abrasion in the region of the injury. Both doctors say, when advised of the true history of the case and the injury suffered by plaintiff, that it is their opinion that the infection was caused from this injury.

There does not seem to be any corrobating testimony as to the said germs having entered at the denuded area on the penis. There was no inflammation, no lymphangitis, no swelling, or soreness at that point. While all the testimony in the case supports the theory of entry at the point of the injury—redness, blueness, swelling, soreness, pain, supuration, accompanied by encephalitis and septicaemia, all following the injury speedily in one continuous sequence without interruption. So we are lead to the conclusion that the finding of the Industrial Commission, that the applicant has failed to prove a connection of the illness with the injury, is not founded upon any competent

evidence, but is clearly, when all of it is considered together, as the Industrial Commission was required to consider it, against the evidence.

The Workmen's Compensation Law was certainly never intended to deprive a person of its benefits by reason of his being unable to definitely and specifically establish the exact point upon his body where the streptococcic germ may have its portal of entry. We think that the applicant has, by the great preponderance of the evidence, indicated that the portal of entry was at the point where the injury was received, and that therefore the order refusing compensation should be vacated, and the cause remanded to the Industrial Commission for further proceedings.

EPHRAIM HANSON, J., concurs.

CHERRY, C. J., did not participate herein.

STRAUP, J.

I concur. I think an award ought to have been granted. In denying compensation I think too much stress is placed on what the commission called "the portal of entry" of the disease germs or streptococci, a genus of micro-organisms the species of which possess no flagella and are nonmotile.

As indisputably shown, the applicant, prior to the injury, was able-bodied and in perfect health. In the course of his employment he received a rather severe injury in the groin. There shortly after the injury was found a condition of inflammation, discoloration, swelling, soreness, and pain, and the development of an infection accompanied by encephalitis and septicaemia requiring surgical operation and draining. The surgeon who first examined the applicant about twelve hours after the injury made no diagnosis of the case. He did not then know of the injury sustained by the applicant, but discovered the condition of inflammation, discoloration, swelling, and soreness in the lower groin, but no well-defined abrasion which he testified could have been covered over by the swollen and discolored conditions. He testified he did

not notice or discover any break in the skin at that region, but that there might have been a slight break sufficient to have been "the portal of entry" which would not be noticed by the naked eye, but which could be determined microscopically, but no such examination was made. The other attending physician who saw the applicant about five days after the injury was asked and he answered: "Q. When you saw him presumably Christmas day, five days after the accident, did you find such an abrasion on his skin as would permit the entrance of a germ or infective agent? A. Yes, it could. Q. It was not healed over then? A. No." He further testified he found no evidence of any trauma to the skin except on the glans penis, but that there was no evidence that such was the portal of entry; that there was no infection around it, no lymphangitis about there; and that it was his opinion "that the encephalitis was due to an injury in the groin," but did not know what occasioned the infection.

The commission found that neither of the attending physicians found "any break in the skin or any portal of entry at the place of the wound complained of through which disease germs could pass into the body, however they did find a small denuded area on the glans of the underside of the penis characterized by them as 'a small ulcer' which might possibly have furnished the portal of entry for the said germs," but that the ulcer was not attributable to the accident, and as "the infection which followed the accident was the result of disease germs entering the body through some portal of entry in the skin accessible to them," the applicant, by a preponderance of the evidence, had not sustained the burden of proof that the disability complained of was "in any wise connected with the accident." Following such contention to its logical conclusion, had a break or an abrasion of the skin been shown at the region of the groin where the applicant admittedly sustained an injury, but it also being shown that the applicant had what was termed "a small ulcer" on the glans penis (which we all

agree, as shown by the evidence and as testified to by the physician who called it an "ulcer," looked like a mere cut by a hair or a sharp instrument), which also could have been "the portal of entry" of the disease germs, the applicant could not recover without showing by a preponderance of the evidence that the germs entered at the break in the skin at the region of the groin and not through the cut on the glans penis. Though it be said that in such case it would be more probable that the entry was through the broken skin at the region of the injury, yet, if the commission found that the entry could have been at either place, and that it was not to its satisfaction shown that it was through the broken skin at the region of the injury, there would be as much reason for affirming an order disallowing an award as here to affirm the order of disallowance.

The question is not one of mere speculation or conjecture that the disability of the applicant is attributable to the injury. The speculation or conjecture consists in speculating or conjecturing that the cut on the glans penis was the portal of entry, when the attending physicians testified, and there is no dispute in their testimony in such particular, that there was no evidence and nothing to indicate that the portal of entry was through the cut in the penis; that there was no infection around it, no lymphangitis about it, and no inflammation or soreness of such parts, just a slight cut as though made by a hair.

The commission did not find that it was as probable or more probable that the cut on the penis was the portal of entry as was some injured part of the groin. It but found that the cut "might possibly" have been the portal of entry without anything to indicate that it was the entrance of the germs. It thus is mere speculation that the disease germs found entrance through the cut and without affecting or in any way disturbing the lacteal glands or tissues of the penis or of other parts, moved down—they knew just where they were going—to the particular place where the groin was injured or was to be injured and there wholly uninfluenced

by any result of the injury and independently thereof created the infection and caused the disability complained of or there started their destruction as a mere coincidence with the injury and without any relation thereto.

In determining the reasonable and probable cause to which the disability of the applicant is attributable, far more important than wandering around to find a "portal of entry" are the undisputed facts that the applicant, prior to the injury, was in good physical condition and "in perfect health"; that he was in the course of his employment rather severely injured in the region of the groin; that the injured parts were swollen, inflamed, discolored, and sore, and caused great pain requiring the applicant to take his bed, send for a physician, and to be taken to the hospital where he remained for several months. Had it not been for the cut on the penis, which I think did not have anything to do with the disability, there would not be much difficulty in attributing the disability to the injury. About all I see in the case is that the applicant was denied compensation because he had a hair-like cut on the glans penis.

I am not unmindful of the contention that the presence of the disease germs in the body can be accountable for only through some break, however slight, in the skin or other aperture, and that no break in the skin at the region of the injured groin was disclosed. One of the attending physicians testified that he had not there discovered any break in the skin, but there could have been such a break and not be noticed or discovered by the naked eye because of the swollen and discolored condition of the groin, but could have been discovered miscroscopically and that no such an examination was made. And then we have the testimony that, if the entrance of the germs was through the cut on the penis, inflammation and an infection of the lacteal glands about there would have resulted and no infection or inflammation of the penis was present.

Still, how stands the case though it be assumed that the cut on the penis was the portal of entry of the germs? They

not having affected the lacteals or tissues of the penis or other parts of the body until they reached the region of the groin injured by the accident, and, if because of a weakened condition of such parts the lodging of the germs resulted in an infection, the injury may still be regarded a contributing cause of the infection, but for which there might not have been an infection. And that could be true though the germs may have been present in or about such region when the injury occurred.

I thus think that on the record an allowance of compensation ought to have been made.

FOLLAND, J. (dissenting).

I am unable to agree to a reversal of the order of the Industrial Commission denying compensation to the applicant. It is not the function of this court to weigh conflicting evidence and to decide where the preponderance lies. That is peculiarly the function of the Industrial Commission. Comp. Laws Utah 1917, § 3148, as amended Laws Utah 1921, c. 67; *Parker* v. *Industrial Commission* (Utah) 5 P. (2d) 573; *Utah Fuel Co.* v. *Industrial Commission,* 76 Utah 141, 287 P. 931; and an unbroken line of decisions since the adoption of the Industrial Commission Act. See cases page 461 Legislative Code Committee report on Proposed Revision of Utah Statutes. The burden of showing a casual relationship between the purported accident and the illness suffered by him rests on the applicant. *Stanley* v. *Industrial Commission* (Utah) 8 P. (2d) 770. This court is not authorized to reverse the findings and decision of the Industrial Commission because the employer or its insurance carrier may have failed to prove, by a preponderance of evidence, that the illness of applicant was caused by reason of infection from some other source than the accidental injury, that is, that the germs entered the system through an ulcer on the glans of the penis. Unless there is satisfactory legal evidence showing a causal relation between the illness

and an accident, arising out of or in the course of employment, the commission is not required to make an award of compensation, and, even if there be such evidence in the record, if there is also other satisfactory legal evidence leading to an opposite conclusion, we may not reverse the decision of the commission, because in that event the findings and decision would be supported by evidence. In this case the findings and decision are supported by the evidence as well as by the failure of applicant to sustain his theory by a preponderance of the evidence.

The illness from which applicant suffered was caused by germ infection. This was not such a result as is ordinarily expected to follow a blow on the leg. The medical testimony shows that applicant suffered from encephalitis of the brain and that this could be caused by germ infection and in no other way. The inquiry therefore at the hearing was directed toward attempting to learn how the infective agent got into the system. The medical experts testified that it could come only through some portal of entry from the outside. The applicant had, when first examined by a physician, what Dr. Walker described as an ulcer on the glans of the penis. All through the testimony of Dr. Walker he referred to this injury on the penis as an ulcer, although at the end of his testimony when asked to describe it he said, "It looked as if it had been cut by a hair or sharp instrument. There was no bruise." Ordinarily medical men use accurate language, especially when using the technical terms of their profession. The other medical expert who examined the applicant several days later said he found a denuded area at the end of the penis. Both doctors testified that this ulcer or cut or denuded area, however it may be described, was such a portal of entry through which streptococcic germs might have entered the system to cause the illness. They also testified that there might have been a microscopic break in the skin at the point where the timber is alleged to have struck the leg of applicant through which an infective agent might have entered, but that it could not

have entered at that point unless there was a break or portal of entry. Neither of the doctors discovered such a break in the area where it is claimed the timber struck the applicant. Both Henderson and his wife examined this area, before either of the doctors examined it, but neither of them saw any evidence of a break in the skin. There was no evidence of blood on the skin or on the clothing and it was not shown that the end of the timber, which it is claimed struck the applicant, had any sharp or jagged points or edges which could have caused a break in the skin. No one examined the area on the leg under a glass or with a microscope. At best, applicant's case rests merely upon speculation. Dr. Walker, with all the facts before him, that is, the testimony that the applicant suffered a blow from a piece of timber striking his leg, the history obtained at the time of his first visit, and the experience gained by his examinations and treatment of the applicant, was asked to give his opinion as to the cause of the illness. He said:

"A. Do you want my opinion now or my opinion at that time?

"Q. Your opinion now? A. From the history that he gave me at that time, it would be impossible—

"Q. Yes; but that history is shown to be incorrect by subsequent testimony. He was irrational at that time. A. We have an ulcer on the penis that we can see, and we have a supposition that there might be a microscopical area on the leg. That is supposition, and the other is a fact. So we take it for granted it was from the penis, although we can't say for sure.

"Q. Suppose you were informed absolutely he was struck a very severe blow and bruised it, possibly bruised it microscopically at least, what would you say then? A. Well, it would be more reasonable."

In view of the record I cannot say that the commission by uncontradicted evidence was obliged to reach but one conclusion. The case rests in speculation. The burden resting on the applicant to prove his case has not been discharged by a showing that there may have been a microscopic portal of entry which may have been caused by the blow through which portal, if it existed, streptococcic germs may have entered to cause the illness from which the appli-

cant suffered. The findings and decision of the commission should be affirmed.

ELIAS HANSEN, J.

I too dissent. It is quite generally held that those whose duty it is to find the facts are not, as a matter of law, bound by the opinions or judgments of expert witnesses. *Hirabelli* v. *Daniels*, 44 Utah 88, 138 P. 1172; 22 C. J. 728 et seq., and cases there cited. It was the province of the Industrial Commission to weigh the opinions expressed by the physicians who testified in this case as to the source of the disease germs which caused the infection which resulted in the disability of Mr. Henderson, and the commission having done so and found the facts, this court is without authority to interfere. The opinions of the physicians who testified in the instant case are not in entire accord as to the source of infection and the resulting disability complained of. In my opinion the evidence in this case brings it more nearly within the rule announced by this court in the case of *Chief Consolidated M. Co.* v. *Salisbury et al.*, 61 Utah 66, 210 P. 929, than within a rule such as is announced in the prevailing opinion. In the opinion of the physician who testified most favorably for the applicant it was by no means certain that the disease germs entered through the place where the applicant was injured while in the course of his employment. The germs may or may not have so entered. Under such circumstances, according to the uniform holding of this court, the findings made by the commission must be sustained.

In my opinion such should be the order in this case.